UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

RAYMUNDO DIMAS, *et al*,                    §
                                            §
        Plaintiffs,                         §
VS.                                         §        CIVIL ACTION NO. C-10-68
                                            §
VANDERBILT MORTGAGE AND                     §
FINANCE, INC., *et al*,                     §
                                            §
        Defendants.                         §

## ORDER

On this day came on to be considered Plaintiffs Raymundo Dimas and Mercedes

Dimas's Motion and Memorandum in Support of Motion for Partial Summary Judgment

(the "Motion").  (D.E. 41.)  For the reasons stated herein, Plaintiffs' Motion is DENIED.

**I.      Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 (federal question) as Plaintiffs bring a cause of action under the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").   The

Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332

(diversity of citizenship) as Plaintiffs and Defendants are citizens of different states and

the amount in controversy exceeds $ 75,000.  (D.E. 24 at 16-17, 25.)

**II.     Factual and Procedural Background**

Plaintiffs filed this action on March 2, 2010.  In response to this Court's Order

directing Plaintiffs to file an amended pleading that complied with Federal Rules of Civil

Procedure 8(a) and 9(b) (D.E. 25), Plaintiff filed an Amended Complaint on April 28,

2010.  (D.E. 24.)  The factual and procedural background of this action is fully recounted in this Court's August 25, 2010 Order on Defendants' Motion to Dismiss.  (D.E. 51.)

At issue on summary judgment is whether the principal debt that the Dimas' owe Defendants deriving from the Retail Installment Contract ("the Contract") for the purchase of a manufactured home in June 2000 was released by Defendants as of October 6, 2005.[1]  When they signed the Contract, the Dimas opted to finance the entire $ 38,915.64 purchase price, a total of $ 97,934.40 in payments.  (D.E. 52 at 3.)  The debt was secured by Plaintiff's land in Jim Wells County, Texas.  A Deed of Trust and Mechanic's Lien, filed June 2, 2000, created security interests in the land.[2]  In 2005, after discovery of irregularities at the Corpus Christi Clayton Homes store where the Contract was signed, CMH and Vanderbilt released the Mechanic's Lien and Deed of Trust on Plaintiff's land, as it related to Plaintiff's Contract.  (D.E. 52 at 4.)

> The Mechanic's Lien Release ("BML Release") provides in relevant part:
>
> CMH Homes, Inc. . . . declares that it is the true and lawful owner and holder of that certain note and indebtedness secured by a MECHANICS LIEN CONTRACT executed by Raymundo Dimas, dated June 1, 2000, and recorded in OFFICIAL PUBLIC RECORDS . . . in the office of the COUNTY CLERK for Jim Wells COUNTY, Texas to which THE MECHANIC LIEN CONTRACT or specific reference is hereby made; **and for a valuable consideration in hand paid, the said, CMH Homes, Inc. does hereby release the lien of said MECHANICS LIEN CONTRACT and has been paid in full.**

(D.E. 41-9) (emphasis added)).  The Deed of Trust Release ("DOT Release") provides:

> Vanderbilt Mortgage and Finance, Inc. . . . declares that it is the true and lawful owner and holder of that certain note and indebtedness secured by a deed of trust and/or mortgage executed by Raymundo Dimas to Danny Blankenship, trustee, and dated June 1, 2000, filed for record in the office

---

[1] Defendants' Response is filed only Vanderbilt, which argues that it alone is owed Dimas's debt.  (D.E. 52 at 1 n.1.)
[2] As noted in the Court's August 25, 2010 Order, Plaintiffs allege fraud in relation to the liens filed on Dimas's land.

> of the Register of Deeds for Jim Wells County, Texas . . . to which deed of trust and/or mortgage or specific reference is hereby made; **and for a valuable consideration in hand paid**, the said Vanderbilt Mortgage and Finance, Inc., does hereby RELEASE the lien of said deed of trust and/or mortgage.

(D.E. 41-9 (emphasis added)).

There is no dispute that the underlying debt in this action, namely Plaintiffs' debt on the Contract, has not actually been paid in full.  (D.E. 52, Exh. 14 (David Barton Decl.) at 3 ("As of August 19, 2010, Mr. and Mrs. Dimas owe Vanderbilt $33,566.07 . . .").)  Rather, the dispute centers on whether Defendants otherwise released Plaintiffs' underlying debt on the Contract when they filed the BML Release and DOT Release. Plaintiff argues that the "paid in full" phrase in the BML Release has the effect of "releasing both the forged lien and deed of trust on Mr. Dimas's real property in Jim Wells County, and also releasing the debt purportedly secured by the forged real estate documents originally owed by Mr. and Mrs. Dimas as 'paid in full.'"  (D.E. 41 at 3-4.) Vanderbilt disputes this characterization.  (D.E. 52.)

## III.    Discussion

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case."  Rivera, 349 F.3d at 247.  The nonmovant "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); see also First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 270 (1968).  The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment").  Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party.  Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

In this case, Plaintiff requests partial summary judgment on the single issue of whether the debt was paid in full, pursuant to Federal Rule of Civil Procedure 56(d). (D.E. 41.)  Under Rule 56(d)(2), "[a]n interlocutory summary judgment may be rendered

on liability alone, even if there is a genuine issue on the amount of damages."  Fed. R. Civ. P. 56(d)(2).  "A partial summary judgment order in accordance with Rule 56(d) is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case."  F.D.I.C. v. Massingill, 24 F.3d 768, 774 (5th Cir. 1994); see Preston Exploration Co. v. Chesapeake Energy Corp., __ F. Supp. 2d __, 2010 WL 2357876, at *1 n.1 (S.D. Tex. June 11, 2010) (citing Massingill).  "Rule 56(d) empowers the Court to determine what material facts are not genuinely at issue, where summary judgment is not rendered on the whole action, so as to clarify the triable issues that remain."  Barrington Group Ltd., Inc. v. Classic Cruise Holdings S. De R.L., 2010 WL 184307, at *4 (N.D. Tex. Jan. 15, 2010) (internal quotation marks omitted).[3]

**B.**     **Has the Plaintiffs' Debt Been "Paid in Full?"**

The threshold issue is whether Vanderbilt and CMH Homes released Plaintiffs' underlying debt on the Contract when they filed the BML Release and DOT Release in the fall of 2005, despite the fact that Plaintiffs' debt was never fully paid.  To answer this question, the Court first addresses the alleged assignment of the Contract to Vanderbilt, then considers the operative language in the releases.

**1.     Assignment of the Contract to Vanderbilt**

As an initial matter, the Court must determine which party in this action was entitled to release the debt owed on the Plaintiff's Contract.  Vanderbilt contends that

---

[3] Defendant argues that Plaintiff's Rule 56(d) partial summary judgment motion "runs afoul of Federal Rule of Civil Procedure 7, which requires him to specify the 'relief' he seeks, and is an impermissible use of Rule 56(d)."  (D.E. 52 at 7.)  The Fifth Circuit has not yet spoken on this issue, and courts within the Circuit have considered motions for partial summary judgment.  See, e.g., Mid-Continental Cas. Co. v. Eland Energy, Inc., 2009 WL 3074618, at *3 & n.6 (N.D. Tex. Mar. 30, 2009) ("Sundown moves for partial summary judgment on certain 'points,' i.e., issues that govern the parties' claims and counterclaims, and it seeks to establish that certain material facts are not genuinely at issue.  This is authorized under Fed.R.Civ.P. . . . 56(d)(1).")  Without controlling authority that a Rule 56(d) motion is procedurally improper, the Court will consider this Motion as a motion for partial summary judgment.

CMH assigned all rights to collect the debt owed under the Contract to Vanderbilt immediately after the transaction occurred, and that, as such, only Vanderbilt had the right to release this debt.  Plaintiff disputes that any assignment occurred. As discussed below, the Court finds that issues of fact remain as to whether an effective assignment to Vanderbilt occurred.

    "An assignment generally transfers some right or interest from one person to another. In Texas, the right to receive payment for a debt is generally assignable." Skipper v. Chase Manhattan Bank USA, N.A., 2006 WL 668581, at *1 (Tex. App. – Beaumont Mar. 16, 2006) (citing Cloughly v. NBC Bank-Seguin, N.A., 773 S.W.2d 652, 655 (Tex. App. – San Antonio 1989)).  "Generally, 'after a debtor receives notice of a valid assignment, payment made by the debtor to the assignor or to any person other than the assignee is made at the debtor's peril and does not discharge the debtor from liability to the assignee.'"  Holloway-Houston, Inc. v. Gulf Coast Bank & Trust Co., 224 S.W.3d 353, 361 (Tex. App. Houston 1st Dist. 2006) (quoting Buffalo Pipeline Co. v. Bell, 694 S.W.2d 592, 596 (Tex. App. Corpus Christi 1985); see also Tex. Bus. & Com. Code § 9.406 ("After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.").

    Here, there is enough evidence of an assignment to Vanderbilt to establish a question of fact.  The Contract states that Vanderbilt "hereby assigns within contract and all Seller's right, title and interest in it, and its collateral to Vanderbilt," the Assignee. (D.E. 52-3 at 5.)[4]   The Contract that was assigned to Vanderbilt explicitly included the

---

[4] The Contract explicitly provides: "Seller agrees to this contract, and subject to acceptance by Vanderbilt Mortgage and Finance, Inc., at its designated office, assigns it to Vanderbilt Mortgage and Finance, Inc., in accordance with the assignment set forth herein."   The assignment provides, "TO VANDERBILT MORTGAGE AND FINANCE, INC. (VANDERBILT): For value received, Seller hereby assigns within

"PROMISE TO PAY," which provides: "Buyer promises to pay Seller the 'Unpaid Balance' as listed under 'Itemization of Amount Financed' above plus interest from the contract date at the rate of 11.24%." (D.E. 52-3 at 3.) As stated in the Contract, the assignment transferred "all" of the Contract, including CMH's right to collect payments to Vanderbilt. Amber Krupacs, Vice President of Vanderbilt, states that on June 1, 2000, Vanderbilt paid CMH $ 38,915.64 as consideration for the assignment. (D.E. 52-8 at 2.)

In order for the assignment to become effective, Dimas must have been notified both that an assignment occurred and that consideration had been paid for the assignment. There is no evidence that Dimas was directly notified either that an assignment had occurred or that Vanderbilt was paid consideration for the assignment. However, notice of the assignment can be actual notice or constructive notice, based on sufficient facts to put the obligor on inquiry. See Olshan Lumber Company v. Bullard, 395 S.W.2d 670, 672 (Tex. Civ. App. -- Houston 1965, no writ) (quoting 4 Corbin on Contracts Section 890, p. 577). Not only did Dimas sign the contract, he made installment payments on the manufactured home to Vanderbilt, not to CMH. When he defaulted on his payments, it was Vanderbilt, not CMH, who notified Plaintiffs that they were in default. It was Vanderbilt who took action to foreclose on the home. (D.E. 52-14; D.E. 52-8.) This evidence at least establishes a question of fact as to whether there was constructive notice of the assignment.

On the other hand, Dimas has presented evidence suggesting that the Contract was never effectively assigned to Vanderbilt. The record is clear that the primary purpose of securing the debts created by CMH Homes' retail installment contracts with

contract and all Seller's right, title and interest in it, and its collateral to Vanderbilt Mortgage and Finance, Inc. (Assignee), together with certain warranties and recourse obligations, if any, contained in the underlying agreement between Seller and Vanderbilt." (D.E. 52-3 at 4-5.)

liens on real property was to ensure that payments on the underlying contractual debt were made by customers with poor credit. Yet CMH Homes retained its security interest in Dimas's property (the BML) – which was ostensibly intended to secure the underlying debt on Dimas's Contract – until long after the alleged assignment of the Contract to Vanderbilt occurred. Nearly five years passed between the time of the alleged assignment in June 2000 and the filing of the BML Release in October 2005. It is unclear why CMH would retain its security interest in Dimas's property for so long if the underlying debt had truly been assigned to Vanderbilt.

In addition, neither party disputes that Vanderbilt and CMH worked together in filing the Releases of these security interests. Vanderbilt's and CMH Homes' management jointly made the decision to release the liens. (D.E. 52 at 4 ("Booth [President of CMH] and Nichols [President of Vanderbilt] decided to release the liens[.]").) The DOT Release and the BML Release both contain the "CMH Homes, Inc." letterhead. ((D.E. 41-8; D.E. 41-9.).) This evidence – showing CMH retained its liens on the property even after the alleged assignment occurred and was jointly involved in the mass lien releases – is inconsistent with an assignment of the Contract to Vanderbilt. Rather, it suggests CMH considered itself as still having an interest in the underlying contractual debt that these liens were intended to secure.

In conclusion, the Court finds that, although Vanderbilt presents some evidence that CMH assigned the Contract to Vanderbilt, issues of fact remain as to whether an effective assignment occurred. As such, issues of fact remain as to whether Vanderbilt or CMH was entitled to release the debt created under the Contract. Holloway-Houston, Inc., 224 S.W.3d at 361.

### 2.   Applicable Law to Determine if the Debt was Released.

#### a.  Generally

Mechanic's liens "are creatures of both the Texas Constitution and the Texas Legislature . . .  The requirements for the fixing and perfection of a statutory mechanic's lien are set forth in Chapter 53 of the Texas Property Code."  In re Kleibrink, 346 B.R. 734, 757-58 (Bkrtcy. N.D. Tex. 2006) (internal citations and quotation marks omitted). Tex. Prop. Code § 53.152 provides the minimal requirements for releasing a mechanic's lien.[5]  See Addicks Services, Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 297 (5th Cir. 2010).  "The purpose of the mechanic's lien is to secure payment for those who furnish labor or materials in connection with the construction of improvements to real property to the extent of the increased value of those improvements to the owner's property. . . . [O]nce the owner has paid the full price to his original contractor, if he has complied with the statutes for doing so, no subcontractor can subject his property to a lien."  In re Waterpoint Int'l LLC, 330 F.3d 339, 343-44 (5th Cir. 2003) (citing Eldon L. Youngblood, Mechanics' and Materialmen's Liens in Texas, 26 Sw. L.J. 665, 676 (1972)).  The same principle is true for a deed of trust.  As one court has explained, "[a] deed of trust has no legal effect apart from the debt or obligation which it is designed to secure. Consequently, under Texas law, a deed of trust is usually extinguished upon payment of the indebtedness which it was created to secure."  Craig v. Ponderosa Development, LP, 392 B.R. 683, 689 (E.D. Tex. 2007) (citing O'Dell v. First Nat'l Bank

---

[5] Tex. Prop. Code § 53.152 provides that "[w]hen a debt for labor or materials is satisfied or paid by collected funds, the person who furnished the labor or materials shall, not later than the 10th day after the date of receipt of a written request, furnish to the requesting person a release of the indebtedness and any lien claimed, to the extent of the indebtedness paid.  An owner, the original contractor, or any person making the payment may request the release."  Tex. Prop. Code § 53.152(a)

of Kerrville, 855 S.W.2d 1, 4 (Tex. App. San Antonio 1991), rev'd on other grounds, 856 S.W.2d 410 (Tex. 1993)).

"[A] release … is an absolute bar to any right of action on the released matter." Addicks Servs., 596 F.3d at 297-298 (quoting Dresser Indus. v. Page Petroleum, 853 S.W.2d 505, 508 (Tex. 1993). In order to establish the affirmative defense of release, the party asserting release is required to prove the elements of a contract. In the Interest of J.P., 296 S.W.3d 830, 835 (Tex. App. Fort Worth 2009) (citing Vera v. N. Star Dodge Sales, Inc., 989 S.W.2d 13, 17 (Tex. App. San Antonio 1998)).

### b.    Effect of Release When Underlying Debt Not Yet Paid

Consistent with the general principles outlined above, both the BML and the DOT at issue in this action recognize that complete release of the liens is proper upon full payment of the underlying debt.[6]  Moreover, it is undisputed that CMH and Vanderbilt executed releases of the BML and the DOT, respectively; that these Releases are valid on their face; and that they were appropriately filed in the County's public records.  (D.E. 52 at 3-4.)   However, the evidence also conclusively demonstrates that full payment of Dimas's underlying debt has not occurred, as Dimas owes Defendants in excess of $30,000.  (D.E. 52-14 at 3.)  Vanderbilt argues that this means Plaintiffs have failed to meet their burden to prove the affirmative defense of release.  Vanderbilt states that, under Texas law, if a release says "paid in full," but the debt was not actually paid in full, the debt is not extinguished by the release. (D.E. 52 at 13-14) (citing First State Bank of

---

[6] The BML states: "If Owner performs all the covenants and pays the Retail Installment Contract according to its terms, this conveyance shall become void and have no further effect, and at Owner's expense, Contractor shall release the lien created by this Contract." (D.E. 41-4 at 4.)  The DOT states: "Should Grantor do and perform all of the covenants and agreements herein contained, and make prompt payment of said indebtedness as the same shall become due and payable, then this conveyance shall become null and void and further force and effect, and shall be released at the expense of Grantor, by the holder thereof, hereinafter called Beneficiary . . . ." (D.E. 41-5 at 2.)

Amarillo v. Jones, 107 Tex. 623, 631 (Tex. 1916); Evans v. Evans, 766 S.W.2d 356, 357 (Tex. App.-Texarkana 1989)).  As such, it is impossible as a matter of law that the full debt was released by this language when Dimas has not paid the full debt.

The Court disagrees with Vanderbilt's characterization of Texas law.  Vanderbilt is correct that, in general, even when a release has been executed, "the underlying indebtedness is not released where the debt is not paid in the manner recited by the release and the note is never paid in full."  See 30 Tex. Jr. 3d Deeds of Trust and Mortgages § 123 (citing Evans, 766 S.W.2d 356).  However, Texas courts have established that "minimal consideration can be sufficient to support the release of a larger indebtedness where the intent to release is shown[.]"  Evans, 766 S.W.2d at 357 (emphasis added).  Courts in such cases may examine parol evidence to determine whether the drafter of the release actually intended to release the underlying note.  Id. (citing Lanier v. Faust, 81 Tex. 186, 16 S.W. 994 (1891); Keel v. Hoggard, 590 S.W.2d 939 (Tex. Civ. App.-Waco 1979, no writ)).  Two cases involving similar circumstances to the present action are illustrative of this rule.

In First State Bank of Amarillo v. Jones, a bank executed a release of a deed of trust creating an interest in a debtor's land when only part of the underlying note had actually been paid.  107 Tex. at 627.  The Texas Supreme Court held that even though there was a valid release document, the release did not effectively extinguish the debt because the evidence conclusively demonstrated that the defendants had not actually intended to release the debt.  Id. at 631.[7]  The court pointed to the testimonies of various

---

[7] The court's full explanation in First State Bank of Amarillo is as follows:

bank officials, including the president who signed the release, stating unambiguously that recital of full payment had been a mistake.  Id.  In contrast, the only evidence presented to disprove the mistake was "the recital of full payment in the instrument itself."  Id.  In light of this evidence on intent, the court found there was no release of the underlying debt, despite the language in the contractual release itself.  Id.

The court applied the same rule in Evans.  766 S.W.2d at 357.  The facts before the court were almost directly analogous to the case at bar.  The plaintiff was owed a debt by defendant and also held a lien on defendant's property.  Plaintiff subsequently executed a release of the lien on the property, even though the underlying debt had not been fully paid.  When the plaintiff sued to collect on the remaining balance due, the defendant argued that the balance due on the note had been released when plaintiff released the lien on the property.  Id. at 356.  But the court rejected the defendant's argument that the situation was controlled by the four corners of the lease unambiguously releasing the debt.  The court explained:

> The lien against the property has been released.  The question before this Court is whether the underlying indebtedness which the lien had originally secured has also been released by this document. The document categorically recites that the underlying indebtedness was paid in full:
>
>> for and in consideration of the full and final payment of all indebtedness secured by the aforesaid lien or liens, the receipt of which is hereby acknowledged, has released and discharged, and

If the recital in the release which was executed by the bank, through its president, to the effect that the [debtor's] note which had been secured by deed of trust in the bank's favor had been paid in full, was in fact a mistake, and the note had not been paid in full, then the bank should not and would not lose its lien by reason thereof. In such circumstances equity would reform the release so as to correct the mistake and speak the truth. On the issue of mistake, the evidence is uncontradicted that the recital of full payment was a mistake, and that the note had not been paid except in part.

107 Tex. at 631.

> by these presents hereby releases and discharges, the above described property from all liens held by the undersigned securing said indebtedness.
>
> . . . [T]he undisputed testimony of both [lender and debtor] is that the note was never paid in full. Thus, the recitation in the release was rebutted by the testimony of all parties to the suit.  <u>Minimal consideration can be sufficient to support the release of a larger indebtedness where the intent to release is shown, but where the stated consideration is shown not to have been delivered, the debt is not extinguished.</u> The [plaintiff] conclusively proved that the debt was not paid in the manner recited by the release. Under these circumstances, [defendant] was required to show that [plaintiff] intended to release the indebtedness despite his failure to fully pay the note.  As a result of his failure to make this showing, there is no lien on the property, but the debt evidenced by the note is intact.

<u>Id</u>. (emphasis added).  In sum, the court found that, because the debt had not actually been paid in full, the release's recitation that full payment had been received did not resolve the issue of whether the release of the lien had the effect of extinguishing defendant's full debt.  Rather, defendant was required to show, through parol evidence or otherwise, that plaintiff "intended to release the indebtedness despite [plaintiff's] failure to pay the note." <u>Id</u>.  If defendant could make this showing, then the full debt would be released.  However, because defendant failed to do so, the release effectively extinguished the lien on defendant's property, but the underlying debt remained intact. <u>Id</u>.[8]

Both <u>First State Bank of Amarillo</u> and <u>Evans</u> stand for the proposition that, when a release categorically recites that the underlying indebtedness was paid in full, but the debt has not actually been paid in full, the debt is not released <u>unless</u> the debtor can show the creditor otherwise intended to release the indebtedness despite his failure to fully pay

---

[8] One notable difference between <u>Evans</u> and the present case is that, in <u>Evans</u>, there were no allegations of fraud in execution of the contracts creating the liens or allegations that the releases were filed in secret. Rather, the court in <u>Evans</u> had before it no other evidence to suggest an intention to make a full release.

the debt.  <u>Evans</u>, 766 S.W.2d at 357; <u>First Bank</u>, 107 Tex. at 631.  The ultimate question involves a factual determination as to the creditor's intentions in filing the release.

### 3.        Whether Dimas's Debt Was Discharged

With these principles established, the Court now must determine whether to grant summary judgment on the issue of whether Dimas's debt has been paid in full.  Plaintiff argues that CMH Homes' BML Release and Vanderbilt's DOT Release unambiguously released the underlying debt owed on the Contract when they were executed on October 6, 2005 and properly filed with the County Clerk on October 17, 2005. (D.E. 41 at 6-7.)  However, the existence of properly executed and filed releases alone will not resolve the issue on summary judgment because the underlying debt has not yet been paid.  Rather, the Court must determine whether the evidence establishes that Vanderbilt and CMH intended to release this debt.  <u>Evans</u>, 766 S.W.2d at 357; <u>First Bank</u>, 107 Tex. at 631.  Parol evidence is admissible, and in fact necessary, to elucidate their intentions in drafting the releases.  <u>Evans</u>, 766 S.W.2d at 357 (citing <u>Keel</u>, 590 S.W.2d 939 (Tex. Civ. App.-Waco 1979, no writ.))   As the party arguing for release, the Plaintiff bears the burden of demonstrating intent to release their debt.  <u>In the Interest of J.P.</u>, 296 S.W.3d at 835.

Plaintiffs argue the summary judgment evidence "conclusively establishes" Vanderbilt's and CMH's intent to release the debt.  (D.E. 41 at 4.)  According to Plaintiffs' version of events, Vanderbilt and CMH discovered around 2005 that their employees committed fraud in the execution of the underlying Retail Installment Contract and the documents placing liens on real property (the DOT and the BML).  After discovery of this fraud, Vanderbilt and CMH filed documents releasing all the

mechanics' liens and deeds of trust executed at the Corpus Christi store, as well as the underlying debt on all Retail Installment Contracts associated with those mechanic's liens and deeds of trust. (D.E. 41 at 5-11.)[9]  Vanderbilt argues the opposite – that the evidence establishes that Vanderbilt unequivocally never intended to release the debt, but only intended to release the lien on the Dimas's property.  (D.E. 52 at 14-15.)  The parties have produced a variety of evidence to support their arguments regarding Vanderbilt's and CMH's intentions with respect to both the BML Release and the DOT Release.  The Court examines the contractual language of each Release in turn, and then examines the summary judgment evidence regarding Vanderbilt's and CMH's intentions in filing these releases.

### a.        The BML Release

The BML Release refers to the Builder's and Mechanic's Lien executed on Dimas's property and states that "for a valuable consideration in hand paid, the said, CMH Homes, Inc. does hereby release the lien of said Mechanic's Lien Contract and has been paid in full."  (D.E. 41-8) (emphasis added).  The Plaintiff urges this Court to interpret this language as unambiguously releasing their debt as a matter of law.  (D.E. 41 at 7.)  However, as explained above, the "paid in full" recitation in the BML Release is not, on its own, sufficient to conclusively demonstrate that the underlying debt was

---

[9] In the Reply in Support of their Motion for Partial Summary Judgment, the Plaintiff argues more specifically that the reason CMH and Vanderbilt chose to release the underlying debt as well as the property liens was that they knew that discovery of notary fraud in the underlying transactions would negatively impact the value of the securities that Vanderbilt created from these debts and sold to investors in pools.  In consequence, he contends, Vanderbilt decided to discharge the debt and, as required under their agreement with investors, repurchase the loan out of the securitization pool.  (D.E. 55 at 7-8; D.E. 56-3 (Myron Glucksman Deposition) at 16.)  He states that "[d]ischarging and repurchasing the entire debt is one of the ways to "cure" a misrepresentation about the validity of the finance contracts made to the investors in the pool or resolve a problem with the enforceability of the loans that could result in potential liability to the pools' investors."  (D.E. 55 at 8.)  Plaintiff offers no evidence to support that this was Vanderbilt's specific motive in filing the releases.

released when it was, in fact, not paid in full. Evans, 766 S.W.2d at 357; First Bank, 107 Tex. at 631.

Vanderbilt argues that, given the assignment of the debt, CMH's intent to release the debt (if any) is "irrelevant," as only Vanderbilt could release the debt. (D.E. 52 at 12.) That is, the "paid in full" language in the BML should have no bearing on whether the debts were released. The Court disagrees. As explained above, issues of fact remain as to whether an effective assignment to Vanderbilt occurred. Moreover, even if an effective assignment to Vanderbilt did occur, the language of the BML Release would not be "irrelevant." Although it would not be legally operative with respect to the underlying debt, CMH's BML Release would still be relevant to the extent that it elucidates Vanderbilt's intentions in filing the DOT Release. CMH's intentions would be particularly relevant given that, by all accounts, CMH and Vanderbilt worked together in filing the Releases. The fact that the BML Release was executed by CMH Homes, not Vanderbilt, would simply make the BML Release a slightly less conclusive source of evidence from which to infer an intent by Vanderbilt to release the underlying debt.

Nevertheless, the Court must examine all the evidence available on summary judgment to determine whether such an intent, or lack thereof, is established from the "paid in full" language in the BML Release. Vanderbilt has presented an alternative possible explanation for why the BML Release states that CMH has been paid in full. Vanderbilt argues that "paid in full" refers only to CMH's being paid in full by Vanderbilt when CMH assigned the debt to Vanderbilt in 2000 in exchange for consideration. (D.E. 52 at 8; 52-8 at 2.) As said, issues of fact remain as to whether this assignment even occurred. In any case, Vanderbilt's explanation that "paid in full"

references only CMH's receipt of payment from Vanderbilt lacks credibility in light of the fact that the BML Release was executed long after CMH had assigned the debt to Vanderbilt.  If the assignment occurred in June 2000, it is not clear why CMH would have waited until October 2005 to file its BML Release and acknowledge that it had been "paid in full" by Vanderbilt.  Moreover, the Plaintiff's explanation – that Vanderbilt and CMH decided to release the debts of their customers in the wake of allegations of fraud by CMH employees in executing the transactions – is equally credible.  Further inquiry is required in order to determine CMH's precise intentions in drafting a BML stating that CMH was "paid in full."

### b. The DOT Release

The DOT Release executed by Vanderbilt provides: "for a valuable consideration in hand paid, the said VANDERBILT MORTGAGE AND FINANCE, INC. does hereby RELEASE the lien of said deed of trust and/or mortgage."  (D.E. 41-9.)  It does not include the recital that Vanderbilt has been "paid in full."  Vanderbilt argues that because Vanderbilt "never said, in writing or otherwise, that anything was 'paid in full' " this means the DOT Release must be read as "unambiguously" releasing only Vanderbilt's lien on Plaintiff's property.  (D.E. 52 at 8-10.)  The Court disagrees.

The DOT Release does not "unambiguously" release only the liens on Dimas's property; rather, the language of the Release could also be interpreted to release Plaintiff's underlying debt.  While it does not contain the "paid in full" recital, the DOT Release states that "for valuable consideration in hand paid," Vanderbilt releases "the lien of said deed of trust and/or mortgage."  Vanderbilt objects that the term "mortgage" does not refer to the debt itself, but refers only to the instrument, the deed of trust, creating

Vanderbilt's security interest in the Dimas's property.  (D.E. 52 at 9-10.)  But "mortgage" can refer (among other things) to any of the following: a "lien against property that is granted to secure an obligation (such as a debt) and that is extinguished upon payment or performance according to stipulated terms"; "[a]n instrument (such as a deed or contract) specifying the terms of such a transaction"; or, "the loan on which such a transaction is based."   BLACK'S LAW DICTIONARY 1101-1102 (9th ed. 2009).   Moreover, as explained, minimal consideration can in some circumstances support a release even when the whole debt has not been paid.  Evans, 766 S.W.2d at 357. Dimas made at least some payments owed on the debt.  (D.E. 52 at 6-7; D.E. 52-14 at 3.)  As such, it simply is not clear from the face of the document what has been released in exchange for "valuable consideration in hand paid": the lien on the property, or the mortgage on Dimas's home.

Under Texas law, "if [a] contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).  More importantly, as explained above, even if the Court were to interpret these contractual terms as unambiguously indicating a release of the underlying debt on Dimas's home, the bare recital of a release would be insufficient to establish a discharge of the underlying debt in its entirety given that the debt was not actually fully paid, absent facts demonstrating Vanderbilt's or CMH's intent to do so. Evans, 766 S.W.2d at 357.  In either case, the summary judgment evidence surrounding the 2005 releases must be examined to further elucidate Vanderbilt's or CMH's intentions in drafting the DOT Release.

     **c.**      **Summary Judgment Evidence of Intent to Release Debt**

The Court finds the summary judgment evidence does not conclusively support that Vanderbilt or CMH intended a release of the underlying debt in executing the Releases.  As an initial matter, declarations submitted by Vanderbilt flatly reject the contention that either Vanderbilt or CMH intended to release manufactured home purchasers' underlying indebtedness when they released the liens.  Mr. Nichols, Vanderbilt's President, states: "[t]he only intended purpose of the releases was to release any and all security interests existing on the land parcels. . . . Moreover, neither Vanderbilt nor CMH ever intended to cancel any indebtedness created by the [Retail Installment Contract] and related to the manufactured homes."  (D.E. 52-9 at 5-6 (Nichols Decl.).)  Vanderbilt's Vice President and Secretary Amber Krupacs similarly states: "Vanderbilt has also never discharged or canceled the debt owed to it by Mr and Mrs. Dimas nor intended to discharge that debt."  (D.E. 52-8 at 3.)  Mr. Booth, CMH's President, likewise asserts: "neither Vanderbilt nor CMH ever intended to cancel any indebtedness created by the RIC [the Contract] and related to the manufactured homes." (D.E. 52-2 at 5).)  While these statements are self-serving, they demonstrate the existence of a genuine issue of material fact as to Vanderbilt's and CMH's intentions in releasing the liens.

Moreover, Vanderbilt presents additional evidence supporting lack of intent. Vanderbilt contends that if it had intended to release the home owners' debts, certain procedures would have been followed.  Specifically, Vanderbilt contends that when a customer pays a debt in full, its standard practice is to stamp the Contract as "paid," and return it to the customer.  Internal Revenue Services regulations also require Vanderbilt to notify the customer and the IRS when a debt is partially forgiven as a partially forgiven

debt is considered income to the borrower.  In this case, Vanderbilt did not follow this procedure.  Plaintiff presents no evidence that they received any notice of cancellation of indebtedness.  Rather, the only change to Plaintiff's account after the filing of the release was a notation that the debt no longer involved land.  (D.E. 52 at 6-7.)

Vanderbilt also contends that, in order to perfect a release of Plaintiffs' debt on their manufactured home, it would have been required under Texas law to follow statutory procedures for removing Vanderbilt's security interest in the home – specifically, Vanderbilt would have been required to file certain forms with the Texas Manufactured Housing Division of the Texas Department of Housing and Community Affairs (TDHCA), pursuant to the Manufactured Housing Standards Act (MHSA).  (D.E. 52 at 17-19) (citing Tex. Occ. Code. § 12.01.207(c)).  Vanderbilt contends that because Vanderbilt did not do so in this case, there could be no release, and Vanderbilt retains the right to collect on its debt and foreclose on Dimas's home.[10]

The Court disagrees with Vanderbilt's argument that its failure to file releases with the Manufactures Housing Division necessarily means the debt, and Vanderbilt's right to foreclose, still exists.  Although Plaintiffs' manufactured home is subject to the procedural requirements of the MHSA, see Tex. Occ. Code § 1201.207 (c), the relevant transactions – the DOT and the BML Releases – involved real property and were subject to the general rules respecting releases of mechanic's liens and deeds of trust discussed

---

[10] Vanderbilt also argues that Dimas's summary judgment evidence is "improper," and requests that it be stricken.  Vanderbilt cites multiple statements in Dimas's motion that Vanderbilt states are unsupported by any evidence.  (D.E. 52 at 20-21 (referencing paragraphs 2, 3, 4, 8, 9, and 14 of the Motion for Partial Summary Judgment).)  Defendant also objects to "overstatements, misstatements, or statements divorced from their proper context," as well as "inadmissible parol evidence."  (D.E. 53 at 21-22.)  As with any summary judgment motion, the Court considers only competent summary judgment evidence. See Fed. R. Civ. P. 56(c), (e); Stingley v. Den-Mar, Inc., 347 Fed. Appx. 14, 17 (5th Cir. 2009).  The Court will not undertake to list each paragraph or supporting evidence that is or is not "competent summary judgment evidence."

above.  See Tex. Prop. Code § 53.152(a) (delineating minimal obligation of contractor to release a lien upon receipt of consideration).  Vanderbilt filed releases with the County in accordance with the requirements for releasing mechanic's liens or deeds of trust on real property.  If these releases were valid contracts, then they are binding upon the parties subject to them.  See In re J.P., 296 S.W.3d at 835 ("A release is a contract subject to the rules of contract construction.")  Thus, Texas law procedures for releasing a lien on a manufactured home are not controlling on the issue of whether the releases discharged Dimas's debt on the home.  Rather, as explained above, the issue remains whether, in filing the releases of the liens on Dimas's property, Vanderbilt also intended to release the debt underlying these liens.  Evans, 766 S.W.2d at 357.[11]

Nevertheless, the fact that Vanderbilt did not go through the procedures required by the TDHCA and the MHSA is still relevant to the issue of Vanderbilt's and CMH's intentions in filing the releases.  The Court finds that the inconsistency in Vanderbilt's procedures, combined with the statements of Vanderbilt and CMH management that no release of the debt was intended, preclude a finding on summary judgment that Vanderbilt or CMH intended to release Dimas's debt in executing the Releases.  See Hershey v. Energy Transfer Ptnrs., L.P., 610 F.3d 239, 249 (5th Cir. 2010) (quoting In re Soybean Futures Litig., 892 F. Supp. 1025, 1058 (N.D. Ill. 1995) ("'[A]s a general matter . . . questions of intent are inappropriate for resolution on summary judgment[.]'")

On the other hand, Plaintiffs have produced some contrasting evidence tending to establish Vanderbilt and CMH did intend to release the underlying debt by filing the

---

[11] The Court also notes that Vanderbilt's contention that its failure to follow Texas law procedures to release debts on manufactured homes demonstrates it never intended to make a full release lacks credibility in light of the fact that Vanderbilt apparently released the liens in order to rectify, or conceal, procedural defects in execution of the liens themselves.

DOT and BML Releases.  While this evidence is insufficient to establish their intent as a matter of law, it is sufficient to raise a genuine issue of material fact as to Vanderbilt's and CMH's intentions.  Plaintiff primarily relies upon the testimony of Mr. Booth, who testified on behalf of CMH Homes with respect to Vanderbilt's and CMH's decision to file the releases in the fall of 2005. (D.E. 41-7 at 3.)  Booth's deposition does not directly indicate an intention on the part of Vanderbilt or CMH to release the debt.  But it does suggest that neither CMH's nor Vanderbilt's intentions in the filing the releases were entirely clear, even to the companies' management.  Indeed, Booth repeatedly stated that he simply <u>did not know</u> why the decision was made to file the releases.  For example:

> Q: "[I]sn't it true the reason why you included that the debt had been paid is because you were aware of the allegations of the fraud and the forgery that had occurred out of Store 214 [the Corpus Christi store of CMH]?"

> A: "I don't know why it was written the way it was written.  I didn't participate in that.  I don't understand that. I'm not a lawyer.  And so I couldn't . . . tell you why the language was different or what it means."

(D.E. 41-7 at 10.)  Moreover, at one point, Mr. Booth referred to the decision to execute releases as the "decision to release the loan," rather than the "lien."  (D.E. 41-7 at 4.)

Mr. Booth's ambiguous statements in his deposition do not suffice to establish Vanderbilt's or CMH's prior intent to release Plaintiffs' debt, particularly in the context of other statements refuting any such intent to do so.  But the ambiguity of Mr. Booth's responses is in stark contrast to the situation in <u>First State Bank of Amarillo</u>, where various bank officials, including the president of the bank who signed the release, unambiguously testified that the release of the full debt had been a mistake and that only a partial release was intended.  "No person testified to the contrary.  No one testified to the existence of any circumstance tending to show that it was not a mistake."  <u>First State</u>

Bank of Amarillo, 107 Tex. at 631.  It also must be repeated that, unlike in either First State Bank of Amarillo or Evans, 776 S.W.2d at 357, this case involves allegations of fraud on the part of the lenders who created the debts at issue.  Plaintiffs' allegations that CMH and Vanderbilt intended to release the debts of home owners in order to nullify, or even conceal, the fraudulent conduct of CMH employees cast a shadow over any statements that Vanderbilt's corporate representatives now make to the contrary.

The Plaintiffs have also presented certain internal documents from CMH Homes that contribute to this ambiguity.  They have discovered that CMH Homes issued "Land Release Checklists" for their customers.  In some of these Checklists, CMH employees checked the box, "YES," next to the question, "is the account paid in full?"  (D.E. 41-14; 41-15.)  When asked about one of these Land Release Checklists, Mr. Booth stated that he had never seen the document before and was not aware of the process under which it had been executed.  (D.E. 41-7 at 14.)  When asked whether the document "indicates the account has been paid in full," Mr. Booth responded: "I know what it says, but I don't know if that's what it means."  (Id.)  Neither the "paid in full" language on these Checklists nor the actions of the CMH employees who executed them unambiguously demonstrate an intent to release the underlying debt.  But at the same time, CMH's management is not entirely clear as to why the Land Checklist Releases were executed or as to what the "paid in full" language meant.  There remain factual questions to be resolved by a fact-finder.

Because issues of fact remain as to the "paid in full" issue, the Court denies the motion for summary judgment on this issue.

**IV.     Conclusion**

For the reasons stated above, Plaintiffs Raymundo Dimas and Mercedes Dimas's

Motion for Partial Summary Judgment is DENIED.  (D.E. 41.)

SIGNED and ORDERED this 3rd day of November, 2010.

Janis Graham Jack
United States District Judge